# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 04-1608

**STATE OF LOUISIANA**

**VERSUS**

**DARWIN GAUTHIER**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 1949-03
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Michael G. Sullivan, and Elizabeth A. Pickett, Judges.

**AFFIRMED.**

**R. Richard Bryant, Jr.**
**District Attorney, 14th Judicial District Court**
**1020 Ryan Street**
**Lake Charles, LA 70602**
**Telephone: (337) 437-3400**
**COUNSEL FOR:**
> **Plaintiff/Appellee - State of Louisiana**

**Paula Corley Marx**
**Louisiana Appellate Project**
**P. O. Box 80006**
**Lafayette, LA 70598-0006**
**Telephone: (337) 991-9757**
**COUNSEL FOR:**
> **Defendant/Appellant - Darwin Gauthier**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**Telephone:  (337) 491-0570**
**COUNSEL FOR:**
  **Defendant/Appellant - Darwin Gauthier**

**Darwin Gauthier**
**Allen Correctional Center - Jupiter C2**
**3751 Lauderdale Woodyard Road**
**Kinder, LA 70648**

THIBODEAUX, Chief Judge.

Defendant, Darwin Gauthier, appeals his jury conviction for second degree kidnapping, a violation of La.R.S. 14:44.1, and aggravated second degree battery, a violation of La.R.S. 14:34.7. The trial court imposed a sentence of thirty-five years at hard labor for second degree kidnapping, with the first two years to be served without the benefit of parole, probation, or suspension of sentence. Defendant was sentenced to fifteen years at hard labor on the aggravated second degree battery charge. The sentences were concurrent. Defendant also appeals as excessive the sentence imposed for second degree kidnapping.

For the following reasons, we affirm the convictions and sentences.

## ISSUES

We shall consider whether:

(1) the trial court erred in allowing prejudicial "other crimes" evidence to be admitted;

(2) trial counsel was ineffective for failing to object to the *Allen* charge given to the jury and in failing to request a special jury instruction;

(3) the evidence was insufficient to sustain a guilty verdict on second degree kidnapping;

(4) the sentence imposed for second degree kidnapping was cruel, unusual, or excessive punishment; and,

(5) the trial court erred in denying Defendant's motion for continuance.

1

# FACTS

The victim, Tory Perrodin,[1] married Defendant on September 6, 2002. They resided together at a home on Taylor Street in Lake Charles. On October 21, 2002, the couple had an argument because Defendant accused the victim of flirting with other men and being unfaithful. Apparently the argument lasted through the evening; sometime after midnight, Defendant advised the victim that they needed to see a priest immediately. The victim saw that he was armed with a nine-millimeter pistol, so she became frightened and complied with his demands that she leave the house with him.

Defendant drove the victim to an abandoned house on Rose Street that belonged to a friend of his. Defendant continued to vigorously question the victim's marital fidelity. He did not accept her denials of wrongdoing and poked the top of her left hand with a screwdriver. Defendant began looking for something in the house, but apparently did not find whatever he was looking for. He then escorted the victim out of the house at gunpoint, threatening to shoot her if she ran.

Defendant then drove the victim to a house on Greenwich Boulevard. On the way, he continued to harangue her, and also punched her in the face. When they arrived at the house, they saw one or two cars parked there. Defendant told the victim he was going to send the occupants to the store, because he was going to kill her.

Defendant then walked the victim into the house and told her to go into the back bedroom. He bound her wrists to a television bracket affixed to the wall above her head. Defendant then pistol-whipped the victim with a pellet gun and

---

[1] "Tory" is the spelling from the trial record; the indictment and both parties' briefs spell the victim's first name "Torre." At the time of the trial, the victim and Defendant were divorced.

kicked her. One of the kicks was so forceful that it knocked her into a wall, damaging it.

Defendant then plugged in a clothing iron. He pulled up the victim's shirt and tucked it into her bra, exposing her midriff. Once the iron was hot, he began questioning her again and burning her when he thought she was lying. He also renewed his earlier threats to kill her. One of the other men in the house spoke to Defendant in an adjacent hallway, asking if everything was alright. Defendant replied that all was well, and sent the other man to the store for beer and cigarettes.

Defendant began receiving calls on his cell phone from his sister, who wanted him to come pick up his children. These calls apparently had a calming effect on Defendant. Eventually, he freed the victim and the couple left to go pick up his children.

The next evening, the couple went to the home of the victim's parents. Her father noticed that her face was injured, and Defendant admitted he had hit her. He agreed to take her to the hospital, but did not do so until two or three o'clock the next morning. The hospital's triage nurse contacted the Calcasieu Parish Sheriff's Office, and the ensuing investigation led to the Defendant's convictions.

**Sufficiency of the Evidence**

Defendant challenges the sufficiency of the evidence. Since a ruling that the evidence was insufficient would necessitate an acquittal, we will address this assignment first, pursuant to *State v. Hearold*, 603 So.2d 731 (La.1992).

Defendant challenges the conviction for second degree kidnapping, but not his conviction for aggravated second degree battery. The test for sufficiency reviews is well-settled. This court has explained:

> When the issue of sufficiency of evidence is raised
> on appeal, the critical inquiry of the reviewing court is

3

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. See *State ex rel. Graffagnino*, 436 So.2d 559 citing *State v. Richardson,* 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The elements of second degree kidnapping are found in La.R.S. 14:44.1 which states, in pertinent part:

A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:

. . . .

(5) Imprisoned or kidnapped when the offender is armed with a dangerous weapon or leads the victim to reasonably believe he is armed with a dangerous weapon.

B. For purposes of this Section, kidnapping is:

. . . .

(2) The enticing or persuading of any person to go from one place to another; or

. . . .

The trial evidence demonstrated that Defendant, while armed with a gun, persuaded the victim, Tory Perrodin, to leave their Taylor Street residence and go to a house on Rose Street. Later, when they left the Rose Street location, Defendant had

4

his gun pointed at the victim, and he threatened to shoot her if she ran. During the course of the evening, Defendant drove the rental car they were using, with the gun in his lap. Thus, the evidence adduced by the State demonstrated the elements of second degree kidnapping.

Defendant's arguments on appeal do not address the elements directly; rather, they amount to an attack on the victim's credibility. However, as noted in *Kennerson*, credibility determinations are within the province of the fact-finder and are not to be second-guessed on review. As another circuit has explained:

> The testimony of the victim alone is sufficient to prove the elements of the offense. The trier of fact may accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. *State v. Johnson*, 529 So.2d 466, 473 (La.App. 1st Cir. 1988), *writ denied*, 536 So.2d 1233 (La.1989).

*State v. Pizzalato*, 93-1415, p. 17 (La.App. 1 Cir. 10/7/94), 644 So.2d 712, 721, *writ denied*, 94-2755 (La. 3/10/95), 650 So.2d 1174.

Counsel follows these arguments with a paragraph of attacks upon the victim's general credibility. He asserts in his brief:

> Kevin Victorian, a former roommate of Darwin, testified that on the night in question, he passed Darwin on the way to his home on Greenwich Blvd. and did not see two people in the car. Gary Allison, a former roommate of Kevin Victorian, testified that on the night of October 21, 2002, he was at the Greenwich Blvd. residence when Darwin walked in with Torre and introduced them. He further testified that he never heard any argument and that they were gone when he woke up and went to work. It is possible these two men would stay in a residence and allow a screaming woman to be tortured in a back bed? It is more possible that Torre accompanied Darwin to the house on Greenwich Blvd. voluntarily, an argument ensued, and Darwin beat her.

5

The foregoing paragraph, as a whole, fails to even address the kidnapping conviction. Kevin Victorian's testimony suggests the victim was not even with Defendant at a key time and place in the events surrounding the kidnapping conviction. However, the force of this point is immediately sapped by the rest of the paragraph, in which counsel acknowledges evidence the victim and Defendant were together at the Greenwich Boulevard house.

Although the victim was the State's sole eyewitness, the testimony of the victim alone can be sufficient to support a conviction. *Id.* Further, Ms. Perrodin's overall account of events surrounding the kidnapping and battery was corroborated in part by the evidence regarding her physical injuries, including significant burns on her torso, a rib fracture, and a nasal fracture. Further, when police searched the back bedroom at the Greenwich Boulevard location, they found a hole in the sheetrock, which the victim testified was where Defendant threw her against the wall. The room also had a bracket mounted in the wall, which she described as the one to which she was tied. She admitted she could not account for a second hole found in the wall. During the investigation, the victim supplied investigators with the wire and shoelaces with which she was tied. She testified she had left them on the floor of the rental car. In searching the crime scene, police also found part of a pellet gun, or BB gun, the victim said Defendant used to hit her in the nose. Police found an ironing board at the scene, but not the iron. Kevin Victorian was at the scene during the search; he affirmed the iron had been there earlier in the day, but claimed it was broken. Apparently, it was never located. The ironing board had what appeared to be bloodstains on it. Also, police found live nine-millimeter ammunition in the victim's car. The ammunition in the victim's car corroborated the presence of a nine-millimeter gun in the household. Most of this evidence had a more direct bearing upon the second-degree battery charge, but is corroborative of the victim's account

of the events surrounding the kidnapping. Defendant's rather amorphous attack upon the victim's general credibility lacks any persuasive force.

In his pro se brief, Defendant alleges a discrepancy in the counsel-filed brief:

> At page 17 of the original brief filed by counsel the facts are misstated, and when there is a discrepancy the transcript prevails.
>
> Gary Allison, a former roommate of Kevin Victorian, testified that on the night of October 21, 2002, he was at the Greenwich Blvd. residence when Darwin walked in with Torre and introduced them.
>
> This statement is belied by the testimony of the same witness at trial as he testified at page 01485 of Volume VII as follows:
>
> Q. And you're saying - you're telling me that you saw Darwin?
>
> A. Uh-huh (yes). Yea. Yes, I did, I seen him.
>
> Q. Darwin came in the house while you were there?
>
> A. Yea, when I was waking up he came in the house and that was it. We said, what's up, hello, you know, and that was it and I was busy getting dressed. Five minutes later his wife come in and introduced me to her, Gary this is my wife. Okay, how you doing? There it is and I had to get out and go to work.
>
> Defendant respectfully moves this Honorable Court to cause the record herein to reflect this change from he and Torre walked into Kevin's house together to the fact that Torre entered the house five minutes after Darwin.

However, he does not allege that the discrepancy should have any effect on the argument made by counsel. The jury heard the testimony. If it had believed Allison, it would have called the kidnapping charge into question, as his testimony indicated the victim moved independently of Defendant. However, the jury

apparently gave more credence to the victim's testimony, which was within its discretion.

Defendant's attack on the sufficiency of the evidence lacks merit. Consequently, we shall proceed to consider the remaining issues.

## Introduction of "Other Crimes" Evidence

Defendant argues the trial court erred in allowing evidence of other crimes to be admitted at trial. As the State observes, this court has previously addressed Defendant's argument in a pre-trial writ bearing docket number 03-1680.

As the State correctly notes, the court's prior review of the issue does not automatically preclude its review on appeal. The supreme court has explained:

> When this court considers questions of admissibility of evidence in advance of trial by granting a pretrial application for supervisory writs (rather than deferring judgment until an appeal in the event of conviction), the determination of admissibility does not absolutely preclude a different decision on appeal, at which time the issues may have been more clearly framed by the evidence adduced at trial. Nevertheless, judicial efficiency demands that this court accord great deference to its pretrial decisions on admissibility, unless it is apparent, in light of the subsequent trial record, that the determination was patently erroneous and produced an unjust result.

*State v. Humphrey*, 412 So.2d 507, 523 (La.1981).

Since Defendant's counsel-filed brief makes no mention of the previous writ ruling, it also lacks any argument that said ruling was patently erroneous or unjust. Similarly, the brief contains no attempt to show how the evidence adduced at trial might have "more clearly framed" the issues addressed in the previous writ. Thus, we decline to revisit this issue on appeal.

**Ineffective Assistance of Counsel**

Defendant argues his trial counsel was ineffective for failing to object to "the *Allen* charge" the court submitted to the jury. In his pro se brief, he also argues counsel was ineffective for failing to strike a juror who knew the State's victim-assistance coordinator and knew the victim's mother. Further, Defendant argues in his pro se brief that counsel was ineffective for failing to impeach the victim's testimony with prior inconsistent statements she made while testifying at his bond hearing.

The analysis for ineffective assistance of counsel claims is well-settled, and has been explained by this court as follows:

> A defendant is entitled to effective assistance of counsel as guaranteed by the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution of 1974. This right is fundamental to our system of justice and a cornerstone in assuring that defendants receive a fair trial not unduly prejudiced by their counsel's ineffective assistance. "Effective counsel" has been defined to mean "not errorless counsel", and not counsel judged ineffective by hindsight, but counsel likely to render reasonably effective assistance. *State v. Ratcliff*, 416 So.2d 528, 531 (La.1982) (quoting *United States v. Fruge*, 495 F.2d 557, 558 (5 Cir.1974)). The claim is assessed by the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Id*. To prevail, the defendant must not only show that counsel's performance was deficient, but also that a reasonable probability existed that he was prejudiced by the deficiency. [*State v.*] *Brooks*, [94-2438 (La. 10/16/95),] 661 So.2d 1333. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

*State v. Antoine*, 00-564, p. 6 (La.App. 3 Cir. 12/6/00), 774 So.2d 353, 357.

While most ineffective assistance claims are more properly addressed in the post-conviction relief process, Defendant is correct in asserting that the current record is sufficient to assess the assignment.

This court has discussed *Allen* charges as follows:

> In [*State v.*] Nicholson, 315 So.2d 639 [(La.1975)], the supreme court set limits to the instructions that a trial

judge can give to a jury after the jury announces it cannot reach a verdict. In *Nicholson*, the court held when a trial court gives a deadlocked jury an instruction that rises to the level of being an "*Allen* charge" or any "coercive modification" of an *Allen* charge, the trial court has committed reversible error. The *Allen* charge originated in *Allen v. United States*, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), where the United States Supreme Court approved a charge designed to break a jury deadlock and accomplish jury unanimity. One characteristic of an *Allen* charge is an admonition to the jurors in the minority to reconsider their opinion in favor of the majority in order to reach a decision. *State v. Schamburge*, 344 So.2d 997 (La.1977); *State v. Washington*, 93-2221 (La.App. 1 Cir. 11/10/94); 646 So.2d 448; *State v. Caston*, 561 So.2d 941 (La.App. 2 Cir. 1990); *State v. Campbell*, 606 So.2d 38 (La.App. 4 Cir. 1992). A second characteristic is the trial court implying to the jury that it must reach a decision because the trial court will not accept a mistrial. *Id*.

The Louisiana Supreme Court has banned the use of *Allen* charges and "modified" *Allen* charges to ensure that juror verdicts are not the product of coercion. *Schamburge*, 344 So.2d 997; *Nicholson*, 315 So.2d 639. "When the duty to reach a verdict is coupled with the trial court's admonition that those in the minority should reconsider their position, there exists an almost overwhelming pressure to conform to the majority's view." *Washington*, 646 So.2d at 454-455.

*State v. James*, 96-472, pp. 3-4 (La.App. 3 Cir. 12/11/96), 687 So.2d 485, 487, *writ denied*, 97-0069 (La. 5/16/97), 693 So.2d 796.

In the present case, the following colloquy is at issue:

**THE COURT:**

All right, Ladies and Gentlemen, as you are aware there's been another note that we have received. The question says, "our options?" Is there a hung jury (or mistrial) or not guilty? Because there's no space for hung jury. Is it the same? Signed Richard A. Hilton.

Anything from the State? I think if he's asking -- if I had to read it I think he's asking indicating that they may be at some type of impasse to be quite candid. But then there's a question as to is there something on the form that they should fill out if that's the situation.

. . . .

**THE COURT:**

Ladies and Gentlemen, I've reviewed the note that's been presented to the Court. At this time I would like to make an additional instruction just as an attempt to see if we can get the matter resolved. I want you -- I have this additional instruction for you to consider and to act on. I want you to realize that this is an important case and I am going to send you back into the deliberation room for another 30 minutes. I am going to try and urge you to come to some kind of agreement.

Do not, however, surrender your individual opinions just to reach a verdict. But do consider the other jurors views whether you're in the minority or in the majority with regard to the issue that you're considering. Please consider each other's views and weigh it against your own conclusions. And I am going to ask that you go back for 30 more minutes and attempt to deliberate to see if we can reach an -- reach this impasse. All right. If you'll go back with the Bailiff.

**[JURY EXITS COURTROOM]**

**THE COURT:**

The Jury has been instructed at this time to attempt to reach a decision with regard to whatever it is that they seem to have not been able to reach a decision on. Do I have anything from the State for the record?

**MS. WILSON:**

Nothing.

**THE COURT:**

Anything from the Defense?

**MR. ST. DIZIER:**

No, Your Honor.

As the State notes in its brief, the scenario in *James* was similar to the

one in the present case. The *James* court noted:

[T]he jury announced it was not able to reach a verdict after three hours of deliberation. When the trial court asked the jury foreman if he thought the jury would be able to reach a verdict with additional deliberation, the foreman

11

answered, "At this time, no, your Honor." The trial court then ordered the jury taken out and recessed court for fifteen minutes to research case law concerning instructions a trial judge can give to a jury when the jury announces it cannot reach a verdict. After the recess, the trial court gave the following instruction to the jury:

> All right. I have this additional instruction for you to consider and act on. This is an important case, and I'm going to return you to deliberate for thirty more minutes and urge you to come to an agreement. Do not, however, surrender your individual opinions just to reach a verdict, but do consider the other juror's views whether you're in the minority or in the majority, consider the other's views and weigh it against your own conclusions, and I'll have the jury return to further deliberate for thirty minutes.

> In giving this instruction, the trial court did not imply to the jurors that it would not accept a mistrial, nor did it attempt to coerce the jury members holding the minority viewpoint to accept the majority position. The trial court's instruction does not contain the restrictive elements that characterize an *Allen* charge or a modified version of an *Allen* charge. It was also within the discretion of the trial court to "urge [the jurors] to come to an agreement." In [*State v.*] *Governor*, 331 So.2d [443] at 453 [(La.1976)], the Louisiana Supreme Court stated:

> > It is safe to state as a settled proposition that when the Court is informed by a jury that they cannot agree, it is not error for the court to impress upon them the importance of the case, *urge them to come to an agreement*, and send them back for further deliberation . . .

> > (Emphasis added.)

> The charge given by the trial court does not rise to the level of an *Allen* charge or a modified *Allen* charge, and therefore, the trial court did not abuse its discretion by giving this instruction to the jury. This assignment of error lacks merit.

*Id.* at 487-88.

The charge at issue in the present case was not an *Allen* charge.

Therefore, Defense counsel's failure to object to the charge did not constitute

12

deficient performance, pursuant to the first prong of the two-part *Strickland* test. Defendant fails to show that trial counsel was ineffective regarding the jury charge.

In his pro se brief, Defendant argues counsel was ineffective for failing to strike juror Marie Holmes, as she knew the State's victim-assistance coordinator and the victim's mother.

The relevant colloquy is as follows:

MS. WILSON:

We're not getting names, but I know who is sitting there. And our victim's coordinator is sitting there, the parents of the victim just came in and the victim came in.

THE COURT:

Let me ask you this. The gist of the thing is the individuals that you've seen or the relationships, would it be -- would it in any way influence you if one or more of those individuals were going to testify?

MS. HOLMES:

Oh, no, no, no, huh-uh, it wouldn't. I mean, I will be as honest as, you know, as I know I am.

THE COURT:

And even if they weren't witnesses but because one of them may be employed by the District Attorney's Office, the -- Ms. Nettie -- that you identified, because of her relationship, would that cause you to lean one way or the other?

MS. HOLMES:

No, huh-uh. No way.

THE COURT:

Mr. St. Dizier I'll ask --

MS. HOLMES:

I just want to be honest. Oh, no way.

MR. ST. DIZIER:

That's probably why we both chose you for the jury. But we would like to know a little bit more detail about your relationship with Ms. Nettie. You say it's a former relationship or is it a present relationship?

MS. HOLMES:

No. Ms. -- the young lady?

MS. WILSON:

He's talking about the lady that you described as dark.

MS. HOLMES:

See, I don't know her name. Everybody in my school is my baby, and they call me Mama Holmes. You know, that's just a tease, 'cause I fed them. You know, I fed her a lot. But I don't know anything personal about her. I just know her face and that's it, and she graduated from LCB.

And then, you know, -- and when they come through that line, all the children is my babies.

MR. ST. DIZIER:

And what was your position at LCB?

MS. HOLMES:

Cafeteria, cook.

MR. ST. DIZIER:

I ate in that cafeteria for four years. And the so-called other lady, the social security representative?

MS. HOLMES:

Yeah, she was my social security representative.

MR. ST. DIZIER:

Was?

MS. HOLMES:

Uh-huh, for my disability. My case is over with.

14

MR. ST. DIZIER:

So that's over with, and you were satisfied with her --

MS. HOLMES:

Oh, yes.

MR. ST. DIZIER:

-- performance. So it wouldn't affect either --

MS. HOLMES:

And we mainly talk on the phone. I only met her one time. And that was when we faced the judge. And then after that that was it. Everything was in my favor.

MR. ST. DIZIER:

I'm satisfied. I have no objection to anything.

THE COURT:

And we do appreciate you being --

MS. HOLMES:

I'm sorry. I didn't know that I had to go through all this routine. I just know --

THE COURT:

It's just to make certain that everybody's rights are protected, the whole thing, and they have opportunity to ask you questions and hear the same information I do. We do thank you.

Defendant's pro se brief cites the following analysis for whether a juror should be excused due to a relationship with the victim or a witness in a case:

A trial judge is granted great discretion in determining whether to seat or reject a juror for cause, and such rulings will not be disturbed without a showing of an abuse of that discretion. *State v. Jones*, 474 So.2d 919 (La.1985). Disclosure during the trial that a juror knows or is related to a witness or the victim is not sufficient to disqualify a juror unless it is shown that the relationship is sufficient to preclude the juror from arriving at a fair

15

> verdict. *State v. Peterson*, 446 So.2d 815 (La.App. 2d Cir. 1984). The connection must be such that one must reasonably conclude that it would influence the juror in arriving at a verdict. *State v. Hodgeson*, 305 So.2d 421 (La.1974).

*State v. Holland*, 544 So.2d 461, 465 (La.App. 2 Cir. 1989), *writ denied*, 567 So.2d 93 (La.1990).

Under the foregoing standard, the record does not reveal a connection between the juror and either the victim or the victim assistance coordinator that would have influenced the verdict. Further, the juror affirmed that she could be fair and impartial. Defendant argues the juror's affirmation that she could be honest was insufficient; however, the colloquy clearly shows the juror affirmed that she could be impartial.

> A charge of juror bias may be removed if the prospective juror is rehabilitated, that is, if the court is satisfied that the juror can render an impartial verdict according to the evidence and instructions given by the court. *State v. Gibson*, 505 So.2d 237, 240 (La.App. 3rd Cir.), *writ denied*, 508 So.2d 66 (La.1987). A trial judge is afforded broad discretion and his ruling should not be disturbed absent an abuse of discretion. *State v. Monroe*, 366 So.2d 1345, 1347 (La.1978).

*State v. Anthony*, 98-0406, p. 24 (La. 4/11/00) 776 So.2d 376, 392, *cert. denied*, 531 U.S. 934, 121 S.Ct. 320 (2000).

In view of the standards discussed, counsel's decision not to oppose the seating of the juror did not amount to deficient performance, and thus did not constitute ineffective assistance of counsel.

Defendant also contends trial counsel failed to make use of prior inconsistent statements the victim made at his bond hearing to impeach her at trial. The testimony at issue focuses on the victim's failure to transport her children to school and Defendant's request to have the victim shoot him on the day following the offenses for which he was convicted. We have examined the victim's testimony at

16

the bond hearing and her testimony at trial. Contrary to Defendant's assertion, that testimony is generally consistent. Further, the victim's testimony during cross-examination at the bond hearing shows an even closer consistency with her trial testimony regarding Defendant's behavior the day after the offense. At the least, the two sets of testimony were sufficiently consistent that trial counsel's performance was not deficient for failing to use the allegedly inconsistent statements to attack the victim's credibility. Therefore, pursuant to *Strickland*, we are unable to conclude that trial counsel was ineffective.

For the reasons discussed, this assignment lacks merit.

## Excessiveness of the Sentence

As with his earlier sufficiency argument, it appears that Defendant is challenging only the sentence for the second degree kidnapping charge, not the sentence for aggravated second degree battery. This court has explained:

> In determining whether a sentence is unconstitutionally excessive, we apply the following standard:
>
> > La.Const. art. I, § 20 ensures that "[n]o law shall subject any person to euthanasia, to torture, or to *cruel, excessive, or unusual punishment.*" A punishment is considered constitutionally excessive if it "(1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more tha[n] the purposeful and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." *State v. Wilson*, 96-1392, p. 3 (La. 12/13/96); 685 So.2d 1063, 1065 *citing Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).
>
> *State v. Blackmon*, 99-391, p. 5 (La.App. 3 Cir. 11/3/99); 748 So.2d 50, 53, *writ denied*, 99-3328 (La. 4/28/00); 760 So.2d 1174.
>
> In *State v. Cook*, 95-2784, p. 3 (La. 5/31/96); 674 So.2d 957, 959, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615,

17

136 L.Ed.2d 539 (1996), the Louisiana Supreme Court held:

> The only relevant question on review, however, was "whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Humphrey*, 445 So.2d 1155, 1165 (La.1984) (citing *State v. Williams*, 412 So.2d 1327 (La.1982)).

*State v. Hymes*, 01-0089, p. 2 (La.App. 3 Cir. 6/6/01), 787 So.2d 604, 605-06.

The relevant sentencing provision is found at La.R.S. 14:44.1(C): "Whoever commits the crime of second degree kidnapping shall be imprisoned at hard labor for not less than five nor more than forty years. At least two years of the sentence imposed shall be without benefit of parole, probation, or suspension of sentence."

Thus, the current sentence is within the statutory limits. At sentencing, the court followed the guidelines set forth in La.Code Crim.P. art. 894.1 and gave detailed reasons to support the sentence. As examples, the trial court noted:

> the Defendant's conviction of a prior felony; the "heinous" nature of his actions; the Defendant's treatment of the victim as extreme "degradation;" the "calculated and premeditated" violence used by the Defendant; the Defendant's use of a weapon in the commission of the offense; and, the fact that the offense resulted in "a significant permanent injury" and "permanent scarring, both physically and mentally, that Ms. Perrodin will have to carry with her for the rest of her life."

The thirty-five year sentence does not shock the conscience and is not disproportionate to the crime committed. This assignment also lacks merit.

**Denial of the Motion to Continue**

Defendant argues the trial court erred by denying trial counsel Charles St. Dizier's motion for a continuance of the trial date. We disagree.

18

As the State suggests in its supplemental brief, a summary of this case's pre-trial history may be helpful to the analysis of this assignment. Defendant's initial counsel was David Ritchie, who is now a district judge. The court appointed James Burks as counsel in June 2003. However, Burks had concerns regarding a possible conflict of interest, so the court appointed St. Dizier as new counsel on December 10, 2003. On December 12, St. Dizier moved for a continuance in open court, citing his caseload, date conflicts with other possible trials, and a lack of time to prepare for Defendant's trial. The court initially denied the motion, noting that counsel had approximately forty days until the then-scheduled trial date and had failed to allege specific difficulties he might have in preparing Defendant's case.

However, the State observed that St. Dizier had another capital case scheduled for the same date as Defendant's then-scheduled trial date of January 20, 2004. Due to that conflict, the State asked the court to appoint new counsel. The court then relieved St. Dizier and appointed Michelle Breaux as Defendant's counsel. Breaux immediately moved for a continuance, citing reasons similar to those argued earlier by St. Dizier. The trial court denied the motion.

On January 20, 2004, more pre-trial matters were addressed, and the trial date was re-set. On February 13, in open court, Breaux indicated she had a conflict of interest and asked to be relieved; she also asked that the trial date be continued. She also filed a written motion to withdraw. Over the State's objection, the court allowed Breaux to withdraw and continued the trial date.

On February 18, the court reappointed St. Dizier as trial counsel. On March 5, the court re-fixed the trial date for May 3, 2004, and ordered that notice be sent to St. Dizier. On May 3, St. Dizier appeared and moved for a continuance.

Imploring the trial court to continue the trial, St. Dizier noted his lack of preparation and disclosed that he had not received an appointment letter for

19

Defendant's case.  An appointment letter, he explained triggers certain procedures in his office.  We observe, however, that St. Dizier moved for a continuance in this same case on *December 12, 2003*, two days after his court appointment and approximately five months before the trial which was ultimately begun on May 3, 2004.  He also acknowledged his office's receipt of a trial notice on March 3, 2004 and admitted that the trial judge personally called and advised him that he would be appointed to Defendant's case.  St. Dizier further admitted that Michelle Breaux, Defendant's previous counsel, called him to discuss this case, but he "blew it off at the time, figuring [he'd] get a letter."  The fact of the matter is that Defendant's counsel knew of his appointment approximately five months before trial but "blew off" preparing for it because of his fidelity to his office procedures.

The trial court denied the motion, and jury selection began the next day.  In regard to continuances, the supreme court instructs:

> The denial of a motion for continuance on grounds of counsel's lack of preparedness does not warrant reversal unless counsel demonstrates specific prejudice resulting from the denial.  *State v. Haarala*, 398 So.2d 1093, 1099 (La.1981).  This specific prejudice requirement has been disregarded by this court in cases where the preparation time was so minimal as to call into question the basic fairness of the proceeding.  *State v. Jones*, 395 So.2d 751 (La.1981); *State v. Durio*, 371 So.2d 1158 (La.1979).  This court has also held that when preparation time is unreasonably short, counsel has been diligent, and there is a general allegation of prejudice, denial of a motion for a continuance is an abuse of discretion which constitutes reversible error.  *Durio*, 371 So.2d at 1161; *State v. Winston*, 327 So.2d 380 (La.1976) (conviction for distribution of heroin reversed when defense counsel was given only three days in which to prepare for trial); *State v. Simpson*, 403 So.2d 1214 (La.1981) (trial court constructively denied defendant right to counsel by appointing new attorney on the day of trial who presented no defense, but only cross-examined the State's witnesses).

*State v. Snyder*, 98-1078, p. 33 (La. 4/14/99), 750 So.2d 832, 856.

In a fairly analogous case, the Louisiana Supreme Court explained:

In the instant case, Mr. Calmes was not aware that he was representing defendant until the morning of trial. Although the Office of Public Defender was counsel of record and had previously received notice of its appointment, the office was totally unaware that a trial date had been set. This is evidenced by its motion for a speedy trial filed six days earlier in which it stated that no trial date had been set. It is also apparent that there had been no contact between the Office of Public Defender and defendant prior to the morning of trial. Although only jury selection took place on the first day of trial, defense counsel had no time to prepare for trial. Moreover, defense counsel was free from fault as the Office of Public Defender never received notice of the trial date; therefore, it had a reasonable explanation for not being prepared for trial. Additionally, defendant's failure to communicate the trial date to his appointed counsel, whom he most probably did not even know represented him, is not a valid reason to require him to go to trial with counsel who has had no time to prepare a defense.

In our view, defendant's right to a fair trial was substantially affected by being forced to go to trial with counsel who had no time to prepare a defense through no fault of his own. Accordingly, we find that the trial judge abused his discretion in denying defendant's motion for continuance. We must reverse. See *State v. Benson*, 368 So.2d 716 (La.1979); *State v. Winston*, 327 So.2d 380 (La.1976).

*State v. Simpson*, 403 So.2d 1214, 1216 (La.1981). The present case is similar to *Simpson* in that both cases appear to involve difficulties with counsel not timely receiving notices that were mailed to their offices. However, at some point prior to trial, the trial judge in this case had informed St. Dizier, by telephone, that he would be appointed to represent Defendant. In contemplation of this appointment, St. Dizier had a phone conversation with one of the previous counsel. Also, he acknowledged that his office had received notice of the trial date, although it apparently did not come to counsel's personal attention in a timely manner. Moreover, St. Dizier personally filed a motion to continue on December 12, 2003. This set of facts, indicating that counsel had some advance notice, both actual and constructive, of trial distinguishes the present case from *Simpson*.

21

We are cognizant of the discussion in a more recent supreme court case:

A judge may not respond to an unexpected disruption of the court's trial schedule, caused by a conflict in defense counsel's own trial schedule which results in counsel's absence on the morning of trial, by denying a motion for a continuance and forcing the defendant to trial without an attorney. *State v. Wisenbaker*, 428 So.2d 790 (La.1983); *City of Baton Rouge v. Dees*, 363 So.2d 530 (La.1978). We observed in *Wisenbaker*, 428 So.2d at 793, that "[i]f counsel, and not defendant, was at fault for counsel's failure to appear or to give timely notice to the trial court of a conflict in schedule, *then sanctions must be taken against counsel, not the defendant.*" (footnote omitted); *see also Dees*, 363 So.2d at 532 ("Whatever may have been the court's right to discipline counsel if the present motion for continuance was untimely or ill-founded, the client cannot be penalized, by the loss of his constitutional right to legal representation at his trial, for his lawyer's lapse arising out of a conflict in the lawyer's trial schedule."). Similarly, a trial judge may not constructively deny the defendant his right to counsel by forcing him to trial represented by an attorney who refuses to participate in any manner in the proceedings because he believes he has not had time to prepare an adequate defense, *State v. Brooks*, 452 So.2d 149, 155-56 (La.1984)(on reh'g), or by an attorney who participates in the proceedings but is completely unprepared to try the case because the court has appointed him as substitute counsel on the morning of trial. *State v. Knight*, 611 So.2d 1381 (1993). We again emphasized in *Knight* that while the trial judge "may have been righteously irritated by the failure of the attorney assigned the case . . . to appear on the date fixed for trial or to make other adequate arrangements . . . . [t]he failings (if any) may warrant attorney sanctions, but . . . cannot be imputed to the accused who is constitutionally guaranteed the right to have an attorney at trial who has at least some opportunity to prepare a defense." *Id.*, 611 So.2d at 1383 (Lemmon, J., concurring).

In the present case, unlike *Wisenbaker*, *Dees*, and *Knight*, counsel appeared in court on the day of trial, claiming that he was fresh from trial in another parish and that as the result of a scheduling conflict, he had been unable to prepare relator's case for trial, although the court had continued the first setting of trial for one month the day after appointing counsel to represent relator. Counsel was therefore physically available to try the case and, unlike the defense attorney in *Brown* [*Brooks*], he did not stand mute after the trial court denied his motion for a

continuance but cross-examined the state's witnesses and argued the case to jurors at the close of evidence.

Nevertheless, we granted relator's application for supervisory review because the record proceedings below not only corroborates counsel's assertion he had not prepared relator's case but also reveals that the trial court had to intervene to keep counsel from pursuing matters which appeared directly adverse to relator's interests, notably, cross-examination of a police witness which threatened to reveal relator's arrest on other serious charges, and which prompted an incendiary confrontation between counsel and relator in open court. The incident clouds confidence that the judicial process functioned properly in this case and was one we could not have anticipated when we denied relator's pre-trial application to review the denial of his motion to continue with the comment that "[d]efendant may reraise on appeal in the event of conviction." *State v. Laugand*, 97-0516 (La. 2/27/97), 689 So.2d 1368 (Lemmon, J., concurring). It further appears that counsel embarked upon trial by issuing an instanter subpoena for a missing alibi witness who ultimately could not be located because he had moved, but did not bring the problem to the court's attention until after the state rested its case. This omission prompted the court to express for the record its own frustration that "[a]t no time did Counsel ask any assistance of this Court to get this witness in," and to observe that counsel had, in any event, failed to file the notice of alibi defense required by La.C.Cr.P. art. 727.

Counsel thereby failed to lay the legal groundwork for presenting an alibi defense; subpoenaed a witness under circumstances which suggested not an informed professional assessment that an alibi defense was a viable one but a desperate attempt to cobble together any defense at the last moment; failed even to provide the court with all of the information necessary to make a fully informed decision on the continuance motion; and, once trial began, pursued questioning of the state's witnesses at trial which revealed lack of even a rudimentary knowledge of the circumstances surrounding the investigation of the crime and the arrests of relator and his co-defendant. Given these circumstances, we agree with Judge Plotkin, who dissented from the panel opinion which affirmed relator's conviction and sentence for second degree murder, that while "[i]t is frustrating to continue a trial where one side is prepared to go forward . . . forcing an attorney to trial who is unprepared does not punish the attorney for his/her lack of readiness, it merely punishes the defendant who is unable to present an adequate defense." *State v. Laugand*,

97-1554, p. 3 (La.App. 4th Cir. 4/7/99), 738 So.2d 209 (unpub'd) (Plotkin, J., dissenting).

*State v. Laugand*, 99-1124, 99-1327, pp. 1-3 (La. 3/17/00), 759 So.2d 34, 35-36.

This case is distinguishable from *Laugand*, as a survey of the trial record shows that trial counsel mounted a vigorous defense, which included jury selection, cross-examination of State witnesses, the calling of a Defense witness, and a lengthy closing argument.

Although counsel did not realize the trial date until four days (counting the weekend) before it occurred, counsel had some prior actual notice of the trial date. Further, the record does not indicate Defendant was prejudiced by the denial of the continuance, as counsel was apparently able to mount a competent defense.

This assignment lacks merit.

## **CONCLUSION**

For the foregoing reasons, the convictions and sentences of Defendant, Darwin Gauthier, are affirmed.

**AFFIRMED.**

24